LARSON, by General Guardian, Appellant, v. SMITH and another, Respondents.

*November 26, 1962—January 8, 1963.*

370

372

374

For the appellant there was a brief by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *J. Robert Kaftan* and *Arthur Kaftan*.

For the respondents there was a brief by *Wilmer & Surplice* and *Everson, Whitney, O'Melia & Everson,* all of Green Bay, and oral argument by *Richard C. Surplice* and *John C. Whitney.*

BROWN, C. J. The trial court made findings of fact which in effect were a determination that Mrs. Larson's renunciation of a part of the inheritance given her by her brother's will was not the product of undue influence exerted upon her by Mrs. Potts, the administrator (her brother-in-law), or anyone else. The present issue is whether such findings are against the great weight and clear preponderance of the evidence.

This court holds that an executor or administrator with will annexed is in a position of trust and confidence toward a beneficiary under the will and an action in which he participates and which deprives the beneficiary of substantial rights without adequate consideration in favor of a third party to whom the administrator is related or closely associated raises a presumption that the transfer of rights is procured by undue influence. The inference to be drawn from this presumption is sufficient proof of undue influence without other affirmative evidence of the exercise of undue influence unless the trial court can reasonably conclude that the evidence as a whole negatives the presence of the undue influence in procuring the transfer. "Implicit in this determination is the fact that the inference is weighed as evidence

in favor of a finding of undue influence." *Schlichting v. Schlichting* (1961), 15 Wis. (2d) 147, 158, 112 N. W. (2d) 149.

We have no doubt that the evidence gives ample support to the trial court's finding that the renunciation was not procured by undue influence.

Mrs. Larson managed her own affairs. She owned and operated a three-apartment business property. Her janitor testified to her mental competency at the times during which the brother's will was in probate. She rented rooms in her home to tenants and managed that property. There is no evidence that she was incapable of conducting her business affairs. Social acquaintances of the period testified to her normal mental capacity at that period.

Those closest to her, particularly her daughter Frances, the appellant, did not complain of her mother's mental state at the time of the transaction of which she now complains. Although she knew of the renunciation in June, 1952, when Mrs. Larson told her that she gave away half her property, Frances recorded no current protest to impeach her mother's capacity of mind or will. There is no evidence that Mrs. Larson ever expressed regret that she had renounced.

In August, 1957, Mrs. Larson's mind had obviously deteriorated and in September Frances had herself appointed her mother's guardian. In November, 1957, she began this action. At that time Mrs. Larson had reached an extreme degree of senility, and could not testify. At the time of trial, Mrs. Potts and Mr. Surplice were dead.

Dr. Kuhs, called as a witness by appellant, testified that he had treated Mrs. Larson in December, 1952. Her complaints then were of physical distress. His diagnosis was "secondary anemia and generalized arteriosclerosis." Then he did not find her senile and he did not make a complete mental examination. The hardening of the arteries would be normal at her age. At the trial he said that senility would be about the same in December, 1952, as in the preceding

June, when the renunciation was executed. In 1955 he saw her again when she broke her leg. He found that at times, then, she was disoriented and at times "was crystal clear."

Mrs. Larson's ability to manage her own affairs at the period in question and the testimony of those business and social acquaintances who were in a position to speak concerning her then mental state and ability to make decisions for herself are quite sufficient to support the trial court's findings that:

"1. Ena K. Larson was a literate, competent individual of sound mentality in 1952 through 1954 and during such period was not a person susceptible to influence.

"2. During the period 1952 through 1954, Ena K. Larson engaged in and conducted various business transactions including the ownership and management of a three-family apartment building, the keeping of roomers in her Monroe avenue residence during such period as she resided there, the collection of rentals and issuing of receipts for roomers and tenants, the handling of life insurance claims relative to her deceased brother, the purchase of a residence in the town of Allouez in 1953, the selling of substantial real estate inherited from her deceased brother, Frank S. Potts, the maintenance of a savings account, the maintenance of a joint checking account with her daughter, Frances Larson, and the writing of her own checks against such account, and none of these transactions were ever questioned or challenged.

"3. Ena K. Larson was capable of comprehending all of the steps taken in the administration of the Frank S. Potts estate."

There is in fact nothing to establish fraud except the presumption of it arising from the relationship of administrator with will annexed, and from which appellant draws the inference that the transaction was induced by fraud or undue influence. That inference is evidence to be weighed against whatever evidence there may be to the contrary. *Schlichting v. Schlichting, supra.* Such evidence includes the capacity of Mrs. Larson at the times in question to man-

age and understand her business affairs; there is no showing that either Mr. Smith or Mrs. Potts or any other person ever suggested that she renounce any part of the benefits given her by the will, much less that anyone persuaded her to do so; except for the presumption, there is no evidence that either Mrs. Potts or Mr. Smith were disposed to influence Mrs. Larson's decision; and the renunciation itself bears evidence that it sprung from Mrs. Larson's own desire to do what she conceived as justice.

Dr. Potts was Mrs. Larson's loving and loyal brother. He was her benefactor. He provided and maintained a home for her; he made generous provision for her in his will and made her beneficiary of life insurance policies. When the doctor died, by reason of the sales by the doctor of properties originally devised to his wife, it developed that what was left to the widow was very materially less than that which would go to Mrs. Larson. At once Mrs. Larson repeatedly said, "It is too much, I don't want that much." The trial court could well believe this was a prompting of conscience. Should the sister stand mute and permit an injustice to the widow of her benefactor? Mrs. Larson thought not. Before any administrator had been appointed, and thus before a confidential relationship existed from which a fraud by the administrator could be presumed, Mrs. Larson declared her preference to have the inheritance apportioned more justly. Her expression of opinion was spontaneous. There was involved no persuasion by anyone else. The renunciation of a part of her inheritance, which she executed a few weeks later, when probate was proceeding in usual course, was consistent with her reaction when she first learned the effect of the provisions of the will.

We conclude that the findings of fact are not contrary to the great weight and clear preponderance of the evidence and the judgment should be affirmed.

*By the Court.*—Judgment affirmed.